UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

   v.          Criminal No. 18-cr-132-JL
                Opinion No. 2022 DNH 001P

Laveneur Jackson


**MEMORANDUM ORDER**

  Defendant Laveneur Jackson's motion for judgment of acquittal hinges on whether there was sufficient evidence to establish several essential elements of the charged crimes, including whether Jackson was identified as the perpetrator.  Jackson was indicted on two counts of unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  After a two-day trial, the jury returned guilty verdicts.  Jackson orally moved for judgment of acquittal at the end of the prosecution's case-in-chief, arguing that the prosecution had not met its burden of proving beyond a reasonable doubt that: (1) he was the perpetrator of the charged crimes; (2) the firearms he allegedly possessed traveled in interstate commerce; and (3) he knew he had previously been convicted of a crime punishable by more than one year.  The court took his oral motion under advisement and, following the jury's verdicts, Jackson submitted a written motion expanding on his arguments.[1]

  After considering the parties' arguments at trial and written submissions, the court denies the motions.[2]  The prosecution introduced evidence from which "a rational jury could find

---

[1] See doc. no. 217.  The government objected to Jackson's written motion, see doc. no. 219, and Jackson filed a reply memorandum.  See doc. no. 221.

[2] The court denied Jackson's motions by endorsed order on November 18, 2021, after considering the parties' arguments at trial and in their written submissions.  This order expands on the court's prior order and explains its reasoning.  See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 n.1 (D.N.H. 2014) (citing In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007)

beyond a reasonable doubt that" Jackson was in fact the person who committed the charged offenses, the Ruger and two SCCY firearms traveled in interstate commerce at some time, and Jackson knew that he had previously been convicted of a crime punishable by more than a year in prison.  Specifically, the witnesses and visual evidence sufficiently connected the person on trial to the perpetrator of the crimes, the government's qualified interstate nexus specialist provided adequately supported opinion testimony that the firearms in question crossed state lines, and the jury could infer from Jackson's Massachusetts court-generated plea documents and two-year sentence that he knew of his convicted felon status at the time of the charged crimes. This constituted proof beyond a reasonable doubt.

I.    **Applicable legal standard**

"No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  The Fifth Amendment's due process clause "prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 309 (1979).  Accordingly, "[a]fter the prosecution closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Considering only the evidence presented in the government's case-in-chief, which, here, was all the evidence, the court assesses "whether 'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006) (quoting United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)).  If the "verdict 'finds support in a plausible rendition of the

---

(noting a district court's authority to later reduce its prior oral findings and rulings to writing), aff'd, 778 F.3d 247 (1st Cir. 2015).

record,'" the conviction must stand.  United States v. Oliver, 19 F.4th 512, 516 (1st Cir. 2021)

(quoting United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993)).

In doing so, the court "take[s] all inferences in the light most favorable to the verdict . . .

give[s] equal weight to both direct and circumstantial evidence, and . . . neither weigh[s] witness

credibility nor require[s] the prosecution to 'eliminat[e] every possible theory consistent with the

defendant's innocence[.]"  Id. (quoting United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir.

2001)).  It "evaluate[s] the sum of all the evidence and inferences drawn therefrom, and

determine[s] whether that sum is enough for any reasonable jury to find all the elements of the

crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not

enough when viewed in isolation."  United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir.

2015).  In conducting a sufficiency review, however, "some degree of intellectual rigor is

required" and the court must "reject those evidentiary interpretations and illations that are

unreasonable, insupportable, or overly speculative."  United States v. Rodríguez-Martinez, 778

F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir.

1995)).

## II.   **Background**

Consistent with this standard, the following background draws on the evidence presented

during the prosecution's case at trial.

### A.     **Jackson's prior felony convictions**

By criminal complaint dated July 25, 2011, Jackson was charged in Lowell District Court

with five counts of violating various sections of the Massachusetts Criminal Code.[3]  In 2013, he

---

[3] See Govt. Ex. 16.

pled guilty to, and was convicted of, two felony counts: (1) possession with intent to distribute a

Class A substance; and (2) possession with intent to distribute a Class B substance.[4]  Each

offense carried a maximum sentence of ten years in state prison.[5]  Jackson was sentenced to two

years of imprisonment at a house of correction and served 64 days.[6]  As part of his plea, Jackson

signed a tender of plea and waiver of rights form in which he acknowledged that he was "aware

of the nature and range of the possible sentence(s)" for the charges to which he was entering a

guilty plea.[7]  In the same form, the presiding District Court judge certified that he "addressed

[Jackson] directly in open court" and, after a colloquy with Jackson, the judge found that Jackson

"knowingly, intelligently[,] and voluntarily waived all of the rights as explained during these

proceedings and as set forth in this form."  The judge further certified that he "made appropriate

inquiry into the education and background of the defendant" and was satisfied that Jackson "fully

under[stood] all of [his] rights as set forth in" the waiver form.[8]

Similarly, in February 2011, Jackson was charged in Lawrence District Court with eight

counts of violating various sections of the Massachusetts Criminal Code.[9]  In August 2014, he

pled guilty to, and was convicted of, four felony counts: two counts of assault and battery on a

police officer, one count of possession with intent to distribute a Class A substance, and one f

---

[4] Id.

[5] Tr. Day 2 (doc. no. 216), at 36:20-37:13; see also M.G.L. c. 94C §32(a); M.G.L. c. 94C §32A(a).  The offenses also carried maximum sentences of not more than two and one-half years a jail or house of correction.  Id.

[6] Ex. 16.  Jackson and his attorney recommended this sentence.

[7] Id.

[8] Id.

[9] See Govt. Ex. 28.

possession with intent to distribute a Class B substance.[10]  The assault and battery on a police officer offense carried a maximum sentence of two and one-half years imprisonment in a house of correction.[11]  Jackson was sentenced to concurrent one-year house of corrections sentences for these offenses.[12]  As part of his 2014 plea, Jackson signed the same tender of plea and waiver of rights form and made the same acknowledgments as he did for his 2013 guilty plea.[13]  The District Court judge similarly certified that he had addressed Jackson directly in open court and, after a colloquy, found that Jackson fully understood his rights and knowingly, intelligently, and voluntarily waived them.[14]

### B.    January 2, 2017 encounter

The government's investigation of this case began on January 2, 2017, when ATF Special Agent John Cook and Task Force Officer Matthew Barter traveled to Riley's Sport Shop, a gun store in Hooksett, New Hampshire (at the time) in response to a call from Riley's staff.[15]  When he arrived at Riley's, Agent Cook saw Jackson and a woman named Angelina Keenan.  Agent Cook met first with Keenan and then spoke with Jackson.  He asked Jackson if he had a felony conviction and Jackson answered that he was a convicted felon.[16]  Jackson then admitted that he

---

[10] Id.  These drug charges carried the same maximum sentences as Jackson's 2013 convictions.

[11] Doc. no. 216, at 46:22 – 47:7; see also M.G.L. c. 265 § 13D.

[12] Ex. 28.

[13] Id.

[14] Id.

[15] Doc. no. 216, at 10:11-17; 12:6-9.  A "task force officer" is a local or municipal police officer that federal law enforcement agencies have deputized to help enforce federal law.  Id. at 10:8-10.

[16] Id. at 13:3-6.

had handled guns in Riley's, but that he did not know it was illegal for a convicted felon to handle guns in a gun shop.  Agent Cook next asked Jackson about the possibility of obtaining back the guns that Jackson previously purchased with Keenan's help.  Jackson responded that it would take some time, that he would have to give some people their money back, and that the guns were in Massachusetts.[17]

Following this encounter, Agent Cook began investigating whether Keenan purchased firearms for Jackson prior to January 2, 2017.[18]  As part of this process, Agent Cook spoke with local gun stores and had them look for ATF Form 4473s completed by Keenan.  Purchasers of firearms from federally licensed firearms dealers must fill out Form 4473s to complete the purchase.[19]  The forms contain biographical information about the purchaser, a series of questions to determine whether the purchaser is someone prohibited from possessing a firearm, information about the firearms dealer, and information about the firearm itself, including the make, model, caliber and serial number.[20]  Agent Cook discovered through this inquiry that Keenan had recently completed two Form 4473s at two different New Hampshire firearms dealers.

### C.    December 23, 2016 purchase

Keenan is a recovering heroin addict.  At some point in the past, in the midst of her addiction and during a period where she would experience "sickness" or withdrawals when she

---

[17] Id. at 13:9-18.

[18] Id. at 14:7-11.

[19] Id. at 6-7.

[20] Id. at 7.

was not using drugs, Keenan met a man she knew as "Lance" through a friend.[21]  Keenan

eventually learned that Lance was looking for people to buy guns for him in exchange for money

and, needing money to support her drug addiction, Keenan spoke to Lance about purchasing

guns for him.  Lance asked Keenan if she had a valid ID and wanted to make money or obtain

drugs by buying firearms for him, and Keenan agreed.  Keenan eventually purchased firearms on

two occasions for Lance.

     The first purchase was on December 23, 2016 at Affordable Firearms in Pelham, New

Hampshire.  Keenan and her boyfriend Benjamin Soule-Jensen picked Lance up and drove to

Affordable Firearms.[22]  Outside the store, Lance gave Keenan cash and told her which firearm he

wanted her to buy.  Once inside, Keenan completed the purchase--she told the clerk which

firearm she wanted to purchase, filled out the necessary paperwork, including an ATF Form

4473, waited for the background check results, and paid at the register.[23]  Keenan then returned

to the vehicle and handed Lance the firearm, and they drove away.  Lance gave Keenan money

or drugs for purchasing this firearm, but Keenan could not recall which.

     Keenan completed and signed a Form 4473 for the December 23 Affordable Firearms

purchase.[24]  The form identified the firearm as a Ruger model SR1911 .45 caliber pistol, with a

---

[21] Doc. no. 215, at 14-15.

[22] Doc. 214, at 4-5.  Keenan later testified that she could not remember whether she and Soule-Jensen picked Lance up on December 23 or December 27.  She testified that it was possible that Lance and a friend picked her up in a silver minivan on December 23, but also possible that they picked her up on December 27.  Id. at 5-7.  On cross-examination, Keenan testified that Lance and his friend brought her to Affordable Firearms on December 23.  Id. at 35.

[23] Id. at 8.

[24] Ex. 1.

serial number of 67162351.[25]  Robert Williams signed the form on behalf of Affordable

Firearms.[26]  ATF Special Agent John Forte testified that this model Ruger was in fact a firearm

and that, in his opinion, it was manufactured in Prescott, Arizona.[27]

### D.    December 27, 2016 purchase

Keenan next purchased two firearms for Lance on December 27 at Riley's in Hooksett.

Like the prior purchase, Lance picked out the firearms and paid for them, and Keenan completed

the purchase.[28]  Riley's had video surveillance inside its store and at the checkout counter.  The

video showed Keenan and Lance looking at firearms in their display cases, speaking with the

store clerks, handling the firearms, and paying for the firearms at the cash register.[29]  Keenan

testified that the man she identified as Lance in the Riley's surveillance video was the same man

she purchased the Ruger firearm for on December 23 at Affordable Firearms and the same man

she was with at Riley's on January 2, 2017.[30]

Keenan completed and signed another Form 4473 for the Riley's purchase and after

finalizing the purchase, she handed the firearms over to Lance in the parking lot.[31]  As with the

---

[25] Id.

[26] Id.  Mr. Williams testified at trial.

[27] Doc. 214, at 75-76.  After allowing defense counsel to voir dire Agent Forte, the court granted the government's request to allow Agent Forte to provide opinion testimony under Federal Rule of Evidence 702.

[28] Id. at 12.

[29] Exs. 5-8a; Doc. 214, at 15-21.

[30] Doc. 214, at 22.

[31] Id. at 21.  Keenan was charged with and pled guilty to making false statements on the Form 4473s during each of these purchases.  She cooperated with the government, received leniency in

prior purchase, Lance gave Keenan either money or drugs for purchasing these firearms.[32]  The Form 4473 for Riley's identified the firearms as SCCY model CPX-2 9MM pistols, one with serial number 382613 and the other with serial number 433115.[33]   Lee Adams signed the form on behalf of Riley's.[34]  Agent Forte testified that this model SCCY was in fact a firearm and that, in his opinion, it was manufactured in Daytona Beach, Florida.[35]

### E.   Jackson's pro se pleadings

Jackson was indicted in this case in August 2018.  Two different court-appointed lawyers represented him until early-December 2019, when Jackson moved to proceed pro se.[36]  After a hearing on the motion, during which the court held a colloquy with Jackson, advised against representing himself, and provided warnings about self-representation pursuant to Faretta v. California, 422 U.S. 806 (1975), the court granted Jackson's motion.[37]  The court also appointed stand-by counsel for Jackson during his period of self-representation.  While representing

---

her sentence as a result of her cooperation, and served a five-month prison sentence, followed by a period of supervised release.  Doc. 215, at 17-21.

[32] Doc. 214, at 22.

[33] Ex. 3.

[34] Id.  Mr. Adams also testified at trial.

[35] Doc. 214, at 78-79.

[36] See Jackson's Motion to Proceed Pro Se (doc. no. 39).

[37] See Court's Margin Order, dated December 2, 2019; see also Doc. no. 203 (transcript of hearing where court provided Faretta warnings about self-representation).

himself, Jackson filed a motion and affidavit in which he made certain admissions relating to the charged crimes.[38]

In his motion, Jackson referred to himself as "I, the defendant" and stated that he asked Keenan if she knew anyone who would be willing to sell Jackson a firearm.[39]  The motion continued:  On December 23, 2016, Jackson met with Keenan and Soule-Jensen and traveled to Affordable Firearms in Pelham.[40]  Jackson gave Keenan $600, Jackson and Keenan entered the store and selected a firearm to purchase, and Jackson returned to Soule-Jensen's vehicle to wait as Keenan purchased the firearm.[41]  Keenan then returned to the vehicle with the firearm and drove Jackson back to his residence in Lowell, Massachusetts.[42]  Jackson also stated in his pro se motion that on December 27, 2016, he arranged with Keenan to purchase another firearm, this time at Riley's in Hooksett, and the two entered the store together and purchased two firearms.[43]

---

[38] See Govt. Exs. 14 & 15.  Prior to trial, the court denied Jackson's motion in limine to exclude these pleadings, as he did not provide any legitimate basis for excluding them, aside from the potential harm they posed to his defense.

[39] Ex. 14 at 3.  Jackson signed the motion by handwritten signature and had his signature notarized.  Id. at 12.

[40] Id.

[41] Id.

[42] Id.

[43] Id. at 4; see also Ex. 15 (Jackson's Affidavit), at ¶ 8.

Jackson's affidavit tracked the statements in his motion, but added that he spoke with ATF agents on January 2, 2017 at Riley's about Keenan's prior firearms purchases.[44]  Jackson signed the affidavit by handwritten signature and had his signature notarized.[45]

### F.    Other trial evidence

Employees of Riley's and Affordable Firearms at the time of the events in question also testified at trial about the purchases at issue and the process for purchasing firearms at each store. Through its witnesses, the government also introduced photographs of the firearms in question and certified copies of Jackson's Massachusetts Registry of Motor Vehicles information, including his license photographs, date of birth, signature, residential address, and the types of credentials or licenses he held in Massachusetts.[46]

At the close of the prosecution's case-in-chief, Jackson moved for judgment of acquittal. The court took Jackson's motion under advisement.  See Fed. R. Crim. P. 29(b).  Jackson did not call any witnesses or, other than cross examining prosecution witnesses, put on his own case. The jury found him guilty on both counts.

## III.   Analysis

Jackson argues that the government failed to establish, beyond a reasonable doubt, three essential elements of the charged crimes: (1) identification of Jackson as the perpetrator of the crimes; (2) the jurisdictional, interstate nexus element; and (3) Jackson's knowledge of his

---

[44] Ex. 15 at ¶ 9.

[45] Id. at 3.

[46] See Ex. 18 (Massachusetts RMV Records).

convicted felon status at the time he possessed the firearms in question.  The court addresses each argument in turn.

###    A.    Identification

"Identification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt."  United States v. Ayala, 289 F.3d 16, 25 (1st Cir. 2002) (quoting United States v. Alexander, 48 F.3d 1477, 1490 (9th Cir. 1995)).  Here, the court instructed the jury that if they had "a reasonable doubt as to whether the United States Attorney has proved any one or more elements of the crime charged, including the identity of the defendant as the perpetrator of the crimes," it was their "duty to find the defendant not guilty."[47]  Jackson argues that no rational factfinder could conclude that the government proved he was the perpetrator because no witnesses identified him in court, the circumstantial evidence did not sufficiently connect the person in the courtroom to the crimes, and the jury could not infer that he was the defendant because he was wearing a mask covering part of his face for the entire trial.[48]  These arguments[49] do not persuade the court.

"Identification can be inferred from all the facts and circumstances that are in evidence," and, although a common trial tactic, "in-court identification by a witness is not necessarily

---

[47] Court's Final Instructions to Jury (doc. 209).

[48] At the time of Jackson's trial, the District of New Hampshire's courtroom protocols for the COVID-19 pandemic required all attendees to wear facemasks at counsel table or in the gallery during in-court proceedings.  The one exception was that lawyers questioning witnesses, and witnesses themselves, could remove their masks during questioning if those individuals showed proof of vaccination or produced a negative COVID-19 test on the day of testimony.

[49] It is unclear whether Jackson is arguing that the government failed to prove that the person sitting in court was Laveneur Jackson, that the person in court was Laveneur Jackson, but not the person who committed the charged offenses, or both.  The court assumes Jackson is arguing both and looks to factors relevant to both scenarios.

required."  Ayala, 289 F.3d at 25; see also United States v. Taylor, 900 F.2d 779, 782 (4th Cir. 1990) ("A witness need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime.").

Preliminarily, the court disagrees that there was no in-court identification of Jackson as the person on trial.  Agent Cook testified during direct examination that he met and spoke with "the defendant, Laveneur Jackson" at Riley's on January 2, 2017.[50]  The prosecutor referred to Jackson as "the defendant, Laveneur Jackson" in his question to Agent Cook, and the defense did not object.  Agent Cook then adopted the factual premise of the prosecutor's question by answering "I did."  The jury could thus draw inferences from both the question and the answer. See United States v. Haddow, No. CR 2012-35, 2014 WL 552108, at *9 (D.V.I. Feb. 12, 2014), aff'd sub nom. United States v. Bailey, 115 A.F.T.R.2d 2015-697, 598 F. App'x 117 (3d Cir. 2015) ("As such, the Court is persuaded that in considering the evidence, a jury may draw inferences from both the content of counsel's questions and the context which may give meaning to those questions."); see also Doc. no. 209 at 10 ("Questions and objections by lawyers are not evidence, unless the witness adopts the facts set forth in the question.").

Agent Cook also testified that he had reviewed surveillance video from Riley's on December 27 and saw Jackson in the video.[51]  Furthermore, Agent Cook obtained a certified copy of Jackson's driver's license from the Commonwealth of Massachusetts and, after the prosecutor introduced the license records as an exhibit and published it to the jury, Agent Cook

---

[50] Tr. Day 2 (doc. 216) at 12:12-14, 29:1-3.

[51] Id. at 29:4-5 (during direct examination); 63:16-24 (during cross-examination).

recognized the person in the license photograph as "the defendant, Mr. Jackson"[52] and the same

man he saw in the surveillance videos and outside Riley's on January 2.

During cross-examination – after the government had already established that Agent

Cook met Jackson in person on January 2 and identified Jackson in surveillance video footage

from December 27 and his license photograph – defense counsel, perhaps inadvertently, had

Agent Cook indirectly identify Jackson as the person sitting at defense table.  The complete

exchange, which neither party mentioned in their written submissions, was as follows:

Q. Mr. Jackson is a tall man?

A. He is.

Q. Is he heavier, the same, or thinner than he was then?  Can you tell by looking

at him today?

A. Today he's thinner.

Q. So, he was a big, tall guy?

A. Yes.

Q. And he's depicted on those video clips, correct?

A. He is.[53]  (emphasis added).

By using the word "today," the jury could infer that Agent Cook was describing the same

person who was sitting in the courtroom as the defendant that day during trial, regardless of

---

[52] Id. at 33:13-20.

[53] Id. at 64:5-13.  The government later established, through Keenan's testimony, that the man in
the December 27 Riley's video was also the man Keenan purchased a firearm for at Affordable
Firearms on December 23.  See Tr. Day 3 (doc. 214), at 22:5-10.  The jury could thus identify
Jackson as the perpetrator of both of the charged crimes.

whether that person was masked or not.  This evidence was thus sufficient to prove, beyond a reasonable doubt, that Jackson was the perpetrator of the charged crimes.

Aside from the sufficient evidence described above, additional proof in the record supported the necessary link between the individual sitting in the courtroom and the individual named in the indictment.  First, both the prosecution and defense counsel "referred to the defendant at trial as the [person] involved" in the alleged events, and defense counsel did not object to the prosecution referring to his client as "the defendant."  United States v. Weed, 689 F.2d 752, 755-56 (7th Cir.1982).  Agent Cook also accepted counsel's description of Jackson as "the defendant," and Keenan connected "Lance" to Jackson during cross-examination.[54]  See Doc. 214, at 26 ("Q. You met -- you met Laveneur Jackson -- well, you've met Laveneur Jackson in 2016 -- A. Yes.  Q. -- or the person you called Lance?  A. Yes.").  A rational jury could infer from counsel's questions and the witness's answers that they were discussing the person on trial.  See United States v. Doherty, 867 F.2d 47, 67 (1st Cir. 1989) (sufficient evidence of identification where witnesses referenced person with the same name as the person indicted); United States v. Strong, No. CR-10-MJ-94-MJK, 2010 WL 3952323, at *5 (D. Me. Oct. 7, 2010) ("Significantly, each of the four witnesses—Ashely Guy, Anne Nixon, Paul Thompson and Jonathan Voisine—identified 'the Defendant' as 'Patricia Strong,' and otherwise used the two names interchangeably.").

Defense counsel's statement to the jury that he was appearing on behalf of Jackson further supported the inference that Jackson was the perpetrator, as courts have found that "in-court identification is not necessary when the defendant's attorney himself identifies his client at

---

[54] The jury also had Jackson's pro se pleadings, in which he identified himself as the "defendant," and described in detail his involvement in the two purchases at issue, as well as the January 2 encounter with law enforcement.

trial." Ayala, 289 F.3d at 25–26 (defense counsel statement to the jury "at the outset of the trial"

prior to witness testimony that she was "appearing on behalf of" the defendants supported

inference of identification).

In addition, no witness denied that the Jackson they were referring to was the Jackson on

trial and in the courtroom, and "at no point [during the witnesses' testimony] was there any hint

that the identity of the defendant was a contested issue." Strong, 2010 WL 3952323, at *5. This

too supports the inference of identity. See Doherty, 867 F.2d at 67 ("All the witnesses saw the

[defendant] in court and heard him referred to as Deliere, and no one denied the identity.");

Alexander, 48 F.3d at 1490 (lack of witness denial of defendant's identity can be "eloquent and

sufficient proof of identity" (quoting Weed, 689 F.2d at 755)).

Nor is this "a case where witnesses had limited exposure to the defendant or were

otherwise uncertain that the defendant was the person" who spoke with law enforcement officers

on January 2 or for whom Keenan purchased firearms on December 23 or 27. Strong, 2010 WL

3952323, at *5. Both Agent Cook and Keenan identified Jackson as the man in the Riley's

surveillance videos and the man who spoke with Agent Cook outside of Riley's on January 2.

Lastly, the jury had Jackson's license photograph, as well as images of him on video,

which allowed them to visually compare the images with the man in the courtroom. See Ayala,

289 F.3d at 25-26 (affirming conviction in part because finder of fact could make "a visual

comparison of the photographs with the defendants in the courtroom" to identify them); United

States v. Hoelscher, 764 F.2d 491, 496 (8th Cir. 1985) ("The evidence adduced at trial, including

references to 'Hoelscher' and 'the defendant,' as well as a photograph and a videotape of

Hoelscher, was sufficient" to prove identity). While Jackson's mask covered his nose and mouth

during the trial, the jury could still compare other aspects of his physical appearance to the prior

visual depictions and draw inferences that the man sitting before them was in fact the man in the

photographs and videos.  This visual evidence, though limited, coupled with the witnesses'

testimony linking Jackson to the crimes, was sufficient proof--absent a direct in-court

identification--from which a rational jury could conclude beyond a reasonable doubt that Jackson

was the perpetrator.[55]

Jackson argues that because he was masked for the entirety of the trial and nobody asked

him to remove his mask, the jury never saw his mouth and nose, making the inference that he

was the perpetrator too speculative to sustain his convictions.  The court disagrees, mainly

because, as discussed above, Agent Cook explicitly linked the Jackson in the surveillance videos

to the man sitting at defense counsel table by comparing Jackson's appearance in the videos to

how he appeared "today" in court.  Given this indirect in-court identification and the weight of

the other evidence linking Jackson to the charged crimes, the court is unconvinced that the jury

needed to see Jackson's mouth and nose in court in order to identify him as the perpetrator

beyond a reasonable doubt.

Just as "the absence of eyewitness identification of [a defendant] is entirely

understandable where . . . the witnesses testified that [the defendant] was wearing a disguise"

during the crime, so too is the absence of direct in-court identification of Jackson understandable

here, where Jackson was "disguised" in a sense during the trial.  United States v. Miller, No. 08-

1260, 2009 WL 82718, at *1 (1st Cir. 2009).  While, in one circumstance, the jury could see the

defendant at counsel table during trial, but not during the charged crimes, and in the other, the

jury could see the defendant during the crimes, but not his complete face during trial, the result is

---

[55] Of course, the government could have avoided this perceived hole in its proof entirely had it
elicited Agent Cook or Keenan to directly identify Jackson in court, which each seemed poised
to do.

the same.  In either scenario, the jury can draw inferences from the circumstantial evidence to conclude that the man who witnesses referred to and the man who appeared in videos and photographs tied to the charged crimes was the same man sitting at defense counsel table.  Not only did no witness give any indication that the "Laveneur Jackson" or "Lance" of whom they spoke was different from the defendant, but their answers to questions made clear that they were speaking about the defendant on trial.  Thus, a rational juror viewing the evidence in the light most favorable to the verdict could find that Jackson was the same individual named in the indictment.  Jackson's motion for judgment of acquittal on this issue must be denied.

### B.    Interstate nexus

Jackson next challenges the sufficiency of the government's proof of the interstate nexus element of the charged crimes.  Specifically, the indictment charges Jackson with possessing firearms "in and affecting interstate commerce" on or about certain dates in December 2016 in the District of New Hampshire.[56]  See 18 U.S.C. § 922(g)(1) (the government must prove beyond a reasonable doubt that the firearm "has been shipped or transported in interstate or foreign commerce").  To affect interstate commerce, the firearms must, at any time after they were manufactured, have moved from one state to another or from a foreign country into the United States.  See United States v. Dixon, 787 F.3d 55, 60-61 (1st Cir. 2015) (holding that "[s]ection 922(g) requires only that a defendant have possessed a firearm in a state other than the one in which it was manufactured . . . that is, that the defendant have possessed a firearm that has

---

[56] See Superseding Indictment (doc. no. 82), at 3, 5.

crossed state lines at some point.") (citing United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000)); Court's Final Instructions to Jury (doc. no. 209).[57]

To establish this element, the government elicited opinion testimony from ATF Special Agent John Forte about the place of manufacture for the firearms in question.  Expert testimony is "appropriate," but not necessarily required, to prove interstate nexus.  See United States v. Cormier, 468 F.3d 63, 72 (1st Cir. 2006) (citing United States v. Corey, 207 F.3d 84, 88-89 (1st Cir. 2000)).  Over the defense's objection, the court qualified Agent Forte to provide testimony in the form of an opinion under Rule 702.  After Agent Forte testified, Jackson moved to strike his testimony under Rules 702 and 703.  Jackson renews that request in his Rule 29 motion, arguing that Agent Forte's opinions were not based on "scientific, technical, or other specialized knowledge" and were not the "product of reliable principles and methods."[58]  Fed. R. Evid. 702. Jackson further argues that Agent Forte's testimony should be stricken because he improperly

---

[57] The government suggests that the interstate nexus requirement can also be met if the firearm travels across state lines after it is purchased and argues that happened here based on Jackson's statements that the guns Keenan purchased for him were in Massachusetts.  The court need not consider this theory because, as discussed below, it finds the government's other evidence of interstate nexus, which occurred up through the time of purchase, sufficient.  Case law from the First Circuit Court of Appeals also suggests that the interstate travel must have occurred before the defendant possessed the firearm.  See United States v. Acosta, 67 F.3d 334, 340 (1st Cir. 1995) (noting that that jury was "entitled to conclude that both weapons had traveled in interstate commerce before Acosta possessed them"); United States v. Joost, 133 F.3d 125, 131 (1st Cir. 1998) (endorsing an interstate commerce instruction that read, in part: "Possession of a firearm or ammunition is in or affecting commerce within the meaning of the statute[] [i]f at some time after it was manufactured, and before the offense was committed, that firearm or ammunition was transported between states or between a state and a foreign country or a foreign country and state.").  In addition, the trial evidence was not sufficiently clear about whether the guns that were allegedly in Massachusetts were the same guns that Keenan had purchased for Jackson on December 23 and 27.

[58] Jackson does not meaningfully renew his challenge to Agent Forte's qualifications, devoting only a half a paragraph to it in his Rule 29 motion.  See doc. no. 217-1, at 8.  Ample evidence nevertheless supported the court's decision to qualify Agent Forte to provide opinion testimony. See doc. no. 214, at 54-65.

based his opinions on inadmissible evidence that other experts in his field do not reasonably rely upon.  See Fed. R. Evid. 703.  While this is a closer question than Jackson's other Rule 29 arguments, the court reaffirms its decision not to strike Agent Forte's testimony.

Where a firearm was manufactured, and thus, whether it traveled in interstate or foreign commerce may require expert testimony based on technical or other specialized knowledge. Corey, 207 F.3d at 88-89; Cormier, 468 F.3d at 72 ("the 'interstate nexus' element of § 922(g) constituted specialized knowledge for which expert testimony would be appropriate").  As an experienced and trained ATF Special Agent and interstate nexus examiner, Agent Forte had the requisite knowledge to give opinion testimony under Rule 702 about the place of manufacture and interstate travel of the firearms in question.  See Corey, 207 F.3d at 89.

The court next turns to whether Agent Forte's opinions were based on reliable principles and methods.  Jackson argues that because Agent Forte described his source material and methodology in vague, non-specific, and conclusory terms, his testimony did not meet the standards of Rule 702 and 703.  He further argues that Agent Forte did not specify whether the otherwise inadmissible ATF "variance" database[59] was something experts in his field reasonably rely upon, and thus, the court could not admit the portion of his opinion that relied on that database.  The court disagrees with Jackson.

Agent Forte completed specialized training to become an interstate nexus examiner, during which he learned how to research whether a firearm has traveled in interstate or foreign

---

[59] ATF grants variances to manufacturers for different reasons, including abbreviations or modifications to gun markings or to approve subcontracted manufacturers, and maintains a database of the variances.  Doc. no. 214, at 72.  Jackson contends that this database was inadmissible hearsay because it was simply what someone else told Agent Forte about the firearms.  As the government does not challenge this characterization, the court will adopt it for purposes of this order.

commerce.[60]  As part of that training, Agent Forte visited firearms manufacturers in the New England area, including Ruger, and received written materials from the manufacturers about where certain firearms are manufactured.[61]  In addition to his training and education, Agent Forte relies on internal and external reference materials, periodicals, and databases, Internet research, and contact with other ATF nexus agents when determining where a firearm was manufactured and whether it traveled in interstate commerce.[62]  He also relies on conversations with firearm manufacturers themselves.[63]

In this case--where Agent Forte did not have the actual firearms in question--he relied on the Form 4473s to obtain the manufacturer, model, and serial number for each firearm.[64]  He then consulted the variance database to determine whether the manufacturers subcontracted out the manufacturing for these particular firearms.[65]  He also reviewed reference material (books and online research) and information previously gathered by other nexus examiners, including notes of interviews.[66]  All of these types of source material, including the variance database, are reasonably relied upon by experts in the interstate nexus field.[67]

---

[60] Id. at 61.

[61] Id. at 61-62.  Agent Forte testified that Ruger provided him with "a large number of documents that indicate their serial number – how they do their sequencing of their serial numbers and where their firearms were manufactured."  Id. at 62:16-20.

[62] Id.

[63] Id. at 63.

[64] Id. at 72-73.

[65] Id. at 71-72.

[66] Id. at 74, 82.

[67] Id.

Jackson contends that because Agent Forte did not specifically identify the ATF's variance database as a tool that experts in his field reasonably rely upon, the jury could not consider the part of his opinion based on that database.  This misinterprets Agent Forte's testimony.  Agent Forte explained that he always checks the variance database when conducting a nexus analysis and confirmed that he looked at his customary reference material to determine whether the manufacturers here "subcontracted [the manufacturing process] to some other manufacturer."[68]  The government then asked: "all of these things that you're talking about, all of the various things that you're looking at, are all of those reasonably relied upon by experts in the field?" to which Agent Forte responded, "yes."[69]

Jackson posits that Agent Forte's reference to "all of the various things" did not include the variance database because he first mentioned that database during an earlier question and answer about situations where he has access to the physical firearm.  This is not a reasonable construction of Agent Forte's testimony.  The prosecutor's question could quite reasonable have been understood as a catch-all that included the variance database that Agent Forte had discussed just minutes prior.  It was also not apparent from this testimony that Agent Forte meant to exclude the variance database from the list of sources reasonably relied upon by other experts in his field, or that he was limiting his reference to the database only to situations where he had access to the firearm.

---

[68] Id.  As Agent Forte explained, one of the purposes of the variance database is to determine whether the listed manufacturer subcontracted its manufacturing for this particular firearm.

[69] Id. at 74:11-14.

After locating the manufacturer, model, and serial number for each firearm, Agent Forte confirmed that each gun was in fact a "firearm" as defined under federal law.[70]  He then determined that the Ruger model SR1911 that Keenan purchased for Jackson on December 23 at Affordable Firearms was manufactured at Ruger's Prescott, Arizona facility.[71]  Through his training, experience, and research, Agent Forte knew that Ruger typically manufactured its model SR1911 firearms in Arizona.[72]  He confirmed that this particular firearm was manufactured at the Arizona facility by reviewing the variance database and verifying that it was not subcontracted for manufacturing at a different facility under a variance.[73]  Because Agent Forte located a variance for a Ruger with a different serial number prefix, he consulted with a representative of Ruger and confirmed that the SR1911 purchased on December 23 was indeed manufactured in Arizona.[74]  While Agent Forte could not recall whether he communicated with Ruger by email or phone, or the name of the person he spoke with, what matters most is that this communication confirmed his opinion that the firearm was manufactured in Arizona.  His testimony was therefore "not simply a summary of out-of-court sources but a thorough opinion drawing on multiple sources to ensure accuracy."  United States v. Luna, 649 F.3d 91, 105 (1st Cir. 2011); Cormier, 468 F.3d at 73 (noting that "an expert witness may not simply summarize

---

[70] Id. at 75-76 (Ruger); 78 (SCCY).  Agent Forte testified that he has test fired the Ruger model at issue and either test fired or watch someone else test fire the SCCY model at issue.

[71] Id. at 76.  This was significant because Ruger also has a manufacturing facility in New Hampshire.

[72] Id.  As discussed above, Agent Forte testified that he had toured Ruger's facilities and had documents that indicated where their firearms were manufactured based on the sequencing of the serial numbers.  Id. at 62.

[73] Id. at 76-77.

[74] Id. at 77.

the out-of-court statements of others as his testimony" quoting United States v. Smith, 869 F.2d 348, 355 (7th Cir. 1989)).

The court thus concludes, as it did during the trial, that Agent Forte's opinion that the Ruger had traveled in interstate commerce, which was based entirely on facts or data reasonably relied on by experts in his field, was the product of reliable principles and methods and admissible under Rule 702.  See Cormier, 468 F.3d at 72-73 (interstate nexus experts may rely on "ATF manufacturing records," publicly available records, as well as "technical manuals, conversations with manufacturers, and [their] prior experience" in forming their opinions without running afoul of Rule 703) (citing Corey, 207 F.3d at 91–92); Luna, 649 F.3d at 105 (same).

The same reasoning applies to Agent Forte's analysis of the SCCY firearms, which followed a similar course.  Based on his specialized training and experience, Agent Forte knew that SCCY had one manufacturing facility in Daytona Beach, Florida.[75]  He testified that he had worked with other SCCY firearms and knew from that experience that its only manufacturing facility was in Florida.  He further testified that he may have referenced the ATF "nexus group" database to confirm that SCCY had one facility in Florida.[76]  Agent Forte was not aware of any information that this model SCCY firearm was manufactured anywhere else and he again checked the ATF variance database to confirm that there were no variances on file for the SCCY pistols at issue.[77]  Because Keenan purchased these SCCY firearms for Jackson at a New Hampshire firearms dealer, Agent Forte opined that the firearms crossed state lines, and thus

---

[75] Id. at 79-80.

[76] Id. at 85-86.

[77] Id.

traveled in or affected interstate commerce.[78]  Although Agent Forte did not recall if he

contacted someone at SCCY to verify the place of manufacture for these firearms, that

information was not necessary to support the admissibility of his opinion or its sufficiency to

satisfy the interstate nexus element.  To the best of his knowledge, and based on his experience

and use of materials reasonably relied upon by his colleagues in the nexus field, Agent Forte

opined that the firearms were manufactured in Florida and traveled to New Hampshire to be sold.

That necessarily satisfied the interstate nexus element for the SCCY firearms.  While Agent

Forte's testimony was not the model of clarity or specificity, any shortcomings were not enough

to render his otherwise credible, straightforward, and well-supported analysis unreliable and

inadmissible.[79]  Jackson's renewed motion to strike Agent Forte's testimony is accordingly

denied and he is not entitled to a judgment of acquittal on this basis.

### C.      Knowledge of convicted felon status

Finally, Jackson challenges the sufficiency of the government's proof of the knowledge-

of-status element of the charged crimes.  To be convicted of unlawful possession of a firearm

under 18 U.S.C. § 922(g)(1), Jackson must have been "convicted in any court of, a crime

punishable by imprisonment for a term exceeding one year," and he must have known that he

had been convicted of a crime punishable by imprisonment for a term exceeding one year at the

time he possessed the firearms in question.  Rehaif v. United States, 139 S. Ct. 2191, 2200

(2019); Court's Final Instructions to Jury (doc. no. 209).

---

[78] Id. at 80.

[79] Assuming that the prosecution knew that defense counsel was poised to challenge Agent
Forte's opinions, its case would have been better served by eliciting more details about Agent
Forte's nexus methodology during his direct examination.

Jackson does not dispute that he was convicted of crimes punishable by prison terms exceeding one year.  Instead, he argues that the government failed to prove that he knew he had been convicted of a crime punishable by more than one year of imprisonment on either December 23 or 27, 2016.  Specifically, Jackson contends that the tender of plea and waiver of rights forms he signed in Massachusetts state court were insufficient to prove knowledge because it was not apparent to the jury from the language in the forms that the Massachusetts judges informed Jackson of the range of sentences for these crimes.  The court disagrees.

A rational jury could infer from the content of Jackson's Massachusetts plea paperwork that the judges in his prior criminal cases held a colloquy where they informed Jackson of the possible range of sentences for the crimes to which he was pleading guilty.  While plea colloquy documentation or information is not required in every prohibited person trial to prove knowledge of convicted felon status, it was only needed here because Jackson did not serve more than a year for his Massachusetts crimes.  Jackson signed two waiver of rights forms in which he acknowledged that he was "aware of the nature and range of the possible sentence(s)" for the charges.  Each set of charges carried maximum sentences of ten years in state prison.  The state court judges certified in the same forms that they "addressed [Jackson] directly in open court" and found that he "knowingly, intelligently[,] and voluntarily waived all of the rights as explained during these proceedings and as set forth in this form."  After inquiring into Jackson's education and background, the judges further certified that they were satisfied that Jackson "fully under[stood] all of [his] rights as set forth in" the waiver form.

Jackson further contends that without the transcript or audio recording of his plea colloquies, the evidence was insufficient as to whether the state court judges actually informed him of the possible range of sentences.  Jackson is incorrect.  Massachusetts law requires that

judges inform defendants, if they are entering a guilty plea, of the potential maximum penalties of the crimes to which they are pleading guilty.  See Mass. R. Crim. P. 12(c)(3)(A) (the judge must "provide notice to the defendant of the consequences of a plea" and "shall inform the defendant . . . of the maximum possible sentence on the charge"); United States v. Guardado, No. CV 4:12-CR-40004-TSH, 2021 WL 3055015, at *5 (D. Mass. July 20, 2021), certificate of appealability granted, No. CV 4:12-CR-40004-TSH, 2021 WL 4121496 (D. Mass. Sept. 9, 2021) ("Under the Massachusetts Rules of Criminal Procedure, judges are required to advise defendants entering guilty pleas of their potential sentencing exposure to ensure their pleas are knowing, intelligent, and voluntary.").

Given the clear mandate of Massachusetts law and the content of Jackson's waiver of rights forms, "there is no reason to suspect that the sentencing court failed to explain the maximum penalties available."  United States v. Guzman-Merced, 984 F.3d 18, 20 (1st Cir. 2020), cert. denied, 2021 WL 1520969, 209 L. Ed. 2d 565, 141 S. Ct. 2546 (2021); see also United States v. Burghardt, 939 F.3d 397 (1st Cir. 2019) ("Burghardt does not dispute that he has pled guilty to offenses punishable by a term of imprisonment well beyond a year.  Nor does he dispute that New Hampshire law requires a judge to make sure that a defendant knows the maximum possible sentence when entering a guilty plea.  So it seems virtually certain that at least one of the two state court judges who accepted Burghardt's guilty pleas in his state court cases . . . told Burghardt face-to-face what his maximum sentence could be.") (citations omitted); United States v. Bryant, 976 F.3d 165, 176 (2d Cir. 2020) (evidence of plea colloquy, where defendant (present in court) read and understood his rights and possible sentences, and the fact that Virginia law required the judge to be satisfied that the defendant understood the charge and consequences of the plea, "remove[d] any doubt that [defendant] was aware of his membership

in § 922(g)(1)'s class").  A rational jury could infer Jackson's knowledge from these documents and the Massachusetts rules requiring judges to inform criminal defendants of the range of possible sentences, particularly because the maximum sentences applicable to each crime for which Jackson was convicted are lengthy.

Jackson was also sentenced to two years imprisonment in a house of corrections (at the recommendation of his attorney) for one set of charges, which further suggests that he was aware that the crimes he was pleading guilty to carried sentences of more than one year in prison. Jackson counters that he never actually served that two-year sentence or served more than a year in prison, so his situation was akin to the hypothetical defendant in Rehaif who "was convicted of a prior crime but sentenced only to probation," and thus did "not know that the crime [wa]s 'punishable by imprisonment for a term exceeding one year.'" Rehaif, 139 S. Ct. at 2198 (quoting 18 U.S.C. § 922(g)(1)).  Jackson's reliance on this hypothetical scenario from Rehaif is misplaced because he was not sentenced only to probation.  Rather, he was sentenced to a prison term exceeding one year and would have known of this sentence from communications with counsel and the court during his plea colloquy.  See Bryant, 976 F.3d at 176 ("Bryant would also have heard, at his sentencing, that he was being sentenced to three years' imprisonment, even though that sentence was being suspended.  Thus, this situation is not akin to the hypothetical situation that concerned the Supreme Court in Rehaif, where a defendant received a sentence of probation on the prior felony and might not have understood that the maximum punishment for the crime was more than one year.").

Lastly, Jackson also admitted to Agent Cook that he was a "convicted felon," lending further support to the jury's conclusion that he knew of his prohibited status.  See United States v. Austin, 991 F.3d 51, 59 (1st Cir. 2021) ("Given Austin's own statements to law enforcement

that he was "'definitely' a convicted felon," it is difficult to believe that, had he been aware of Rehaif's holding, Austin would have attempted to contest the status element at trial.").  Viewing this evidence in totality, and in the light most favorable to the verdict, it was sufficient for a rational jury to conclude beyond a reasonable doubt that Jackson knew that he had been previously convicted of crimes punishable by more than one year at the time he possessed the firearms in question in December 2016.

## IV.    **Conclusion**

For the reasons stated above, Jackson's oral and written[80] motions for judgment of acquittal are DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: January 4, 2022

cc:    Anna Z. Krasinski, AUSA
       Seth R. Aframe, AUSA
       Simon R. Brown, Esq.

---

[80] Doc. no. 217.